UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Carmen Marquez-Marin,
         Plaintiff

         v.                              Civil No. 05-ds-247-SM (NH)
                                         Civil No. 05-cv-1619-HL (PR)
                                         Opinion No. 2006 DNH 128

Alberto Gonzales,
Attorney General of the United States;
and Humberto "Bert" Garcia,
U.S. Attorney for the Dist. of Puerto Rico,
         Defendants

**O R D E R**

     Carmen Marquez-Marin is a former Assistant United States
Attorney ("AUSA") for the District of Puerto Rico, who brought
this three count action claiming her employment was wrongfully
terminated and saying she was the victim of unlawful
discrimination.  By prior order, the court dismissed her claims
against Humberto "Bert" Garcia (counts two and three).  What
remains, then, is a single official capacity claim against
Alberto Gonzales, the Attorney General of the United States, in
which Marquez alleges that she was the victim of both gender and
national origin discrimination.  See generally Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.[1]  Given the
nature of Marquez's claim, the defendant shall be referred to as
the Department of Justice ("DOJ").

The DOJ moves for summary judgment, asserting that Marquez's
employment was terminated for entirely non-discriminatory reasons
and, therefore, says it is entitled to judgment as a matter of
law.  Marquez objects.  For the reasons set forth below, the
DOJ's motion for summary judgment is denied.

### Standard of Review

When ruling on a party's motion for summary judgment, the
court must "view the entire record in the light most hospitable
to the party opposing summary judgment, indulging all reasonable
inferences in that party's favor."  <u>Griggs-Ryan v. Smith</u>, 904
F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate
when the record reveals "no genuine issue as to any material fact
and . . . the moving party is entitled to a judgment as a matter
of law."  Fed. R. Civ. P. 56(c).  In this context, "a fact is
'material' if it potentially affects the outcome of the suit and

---

[1]     Pursuant to 42 U.S.C. § 2000e-16(c), Marquez brings
this action against Attorney General Gonzalez in his official
capacity, as head of the governmental agency that formerly
employed her.

a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence."  <u>Intern'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.</u>, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986) (citations omitted).  The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with <u>evidence</u> that conflicts with that proffered by the moving party.  <u>See generally</u> Fed. R. Civ. P. 56(e).  It naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore bald assertions, unsupported conclusions, and mere speculation.  <u>See Serapion v. Martinez</u>, 119 F.3d 982, 987 (1st Cir. 1997).

## Background

While the reason(s) for her discharge are very much disputed, the parties generally agree on the details of Marquez's employment history.  She began working as an AUSA in the United

3

States Attorney's Office for the District of Puerto Rico on
December 16, 2001, under a temporary 14-month appointment.  After
completion of her background investigation, Marquez's temporary
appointment was converted to a non-temporary excepted service
AUSA appointment, subject to a two-year "trial period," during
which her employment could be terminated without cause or right
to appeal.

     During the first year of her employment, Marquez enjoyed her
work and received positive comments on her performance.  In mid-
2002, Humberto "Bert" Garcia was appointed as the new United
States Attorney for the District of Puerto Rico.  Shortly
thereafter, Garcia named AUSA David Rivera as head of the
narcotics division, with supervisory authority over Marquez.
Marquez says that within a short period of time, a "boys' club"
developed, in which Rivera and other male AUSAs (many of them
non-natives of Puerto Rico) would gather to the exclusion of
female AUSAs.  Marquez also says that, although he was her direct
supervisor, Rivera refused to take telephone calls from her and
another female AUSA, and often spoke disparagingly of native
Puerto Ricans.

4

In 2003, Marquez came to believe that there were substantial differences in the salaries that were being paid to various AUSAs in the office, with preference being given to men, particularly those who were from the states, rather than Puerto Rico.  Marquez told her superiors of her concerns and spoke with Garcia, among others.  She also expressed her concern that she was being subjected to disparate and often demeaning treatment, at least in part, as a result of the "boys' club" atmosphere in the office. Eventually, Marquez voiced her concerns to the office's equal employment opportunity contact person.  She also spoke with the office's sexual harassment contact person.  She says none of the issues she raised was addressed in a meaningful way.

In August of 2003, Rivera gave Marquez a progress review, in which he advised her that she should devote more time and effort to improving the quality of her writing, the timeliness of her submissions, and the quality of her efforts to solve problems before presenting them to her supervisors.  Marquez took issue with Rivera's comments, refused (at that time) to sign her performance evaluation, and asked for a transfer to the white collar unit.  Later, in November of 2003, Rivera wrote a "memo to file" describing what he perceived to be Marquez's hindrance of the office's prosecution of operation "Grand Slam."

Subsequently, however, Marquez received national recognition from the Department of Justice for her role in successfully prosecuting that case.

In February of 2004, the United States Attorney's Office was evaluated by the Evaluation and Review Staff of the Executive Office of the United States Attorneys ("EARS").  Marquez says she and other female AUSAs spoke candidly in their EARS interviews about both gender and national origin discrimination that pervaded the office and what they perceived to be disparate treatment directed at them.  Very shortly thereafter, on February 11, 2004, all four female AUSAs were transferred to other sections within the office.  Marquez says she was transferred to violent crimes – a unit to which she had specifically asked not to be assigned.  Not surprisingly, she says her transfer (although it did not involve a reduction in pay) was punitive and in response to her earlier complaints about discriminatory treatment.

In March of 2004, Marquez received a performance appraisal for the year 2003.  She was rated as "meets to exceeds expectations" in all five critical performance elements, as well as overall.  Nevertheless, on April 1, 2004, she filed a formal

grievance, challenging her employment evaluation and requesting
that her rating be upgraded from "meets to exceeds expectations"
to "substantially exceeds" expectations," presumably because of
her exceptional work on project Grand Slam.  Meanwhile, she says
Rivera began exploring means by which to terminate her
employment.  In support of that view, she points to the "memo to
file" Rivera drafted in November of 2003, using what Marquez
alleges is false and disparaging language to describe her job
performance.  Then, in the wake of her April 1 grievance, Marquez
says Rivera drafted the DOJ's official response (using language
similar to that in his "memo to file") and placed another
employee's signature on that response, without the employee's
knowledge.

     In May of 2004, approximately one month after Marquez filed
her grievance, the DOJ began the process of taking formal
personnel action against Marquez, including terminating her
employment.  On June 25, 2004, Marquez contacted an Equal
Employment Opportunity counselor at the Executive Office for
United States Attorneys, complaining of gender-based and national
origin discrimination.  Approximately six weeks later, by letter
dated August 4, 2004, U.S. Attorney Garcia proposed that Marquez
be removed from her position within thirty days after presenting

7

her with a termination letter.  Subsequently, he decided to
expedite that process because, in his view, things were getting
worse, not better, with regard to Marquez's performance and
attitude.

On August 27, 2004, Marquez was issued a letter of
termination, which explained that her employment was terminated
because of misconduct, a pattern of dishonesty, and a pattern of
non-compliance with established internal policies and/or the law.
Marquez points out that, within the year, the U.S. Attorney
determined that another AUSA should not be retained.  He,
however, was afforded the opportunity to resign because,
according to the DOJ, he did not have an attitude or discipline
problem like Marquez.  She points to the allegedly disparate
treatment of that AUSA – an AUSA she suggests was similarly
situated to her – as further evidence that she was subjected to
unlawful discrimination.

**Discussion**

I.   <u>Title VII and Gender-Based Discrimination–
     The Analytical Framework</u>.

Title VII of the Civil Rights Act of 1964 (as amended) makes
it unlawful for employers "to fail or refuse to hire or to

discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  In cases such as this, where there is little overt evidence of gender-based discrimination, courts typically employ the burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See also Carey v. Mt. Desert Island Hosp., 156 F.3d 31, 34 (1st Cir. 1998).

The Court of Appeals for the First Circuit has summarized the McDonnell Douglas burden-shifting paradigm as follows:

> Under this formulation, a plaintiff opens with a prima facie showing of certain standardized elements suggestive of possible discrimination.
>
> * * *
>
> Establishment of the prescribed prima facie case creates a presumption that the employer engaged in impermissible [gender] discrimination.  However, to rebut this presumption, the employer need only articulate a legitimate nondiscriminatory reason for the employee's termination.  The employer's obligation is simply one of production.  The burden of persuasion remains the employee's at all times.

LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993) (citations and internal quotation marks omitted).

So, under the McDonnell Douglas paradigm, if the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer, which must articulate a legitimate, non-discriminatory justification for the adverse employment action taken against the plaintiff.  If the defendant succeeds in carrying that burden of production, the burden of proof remains with the employee, who must demonstrate that the reason articulated by the employer was a mere pretext for unlawful gender discrimination.  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993).  See also LeBlanc, 6 F.3d at 842.  To carry that burden, the employee must produce "not only minimally sufficient evidence of pretext, but evidence that overall reasonably supports a finding of discriminatory animus."  Id. at 843 (citation and internal quotations omitted).  He or she "may not simply refute or question the employer's reasons.  To defeat summary judgment at this stage, a plaintiff must produce evidence that the real reason for the employer's actions was discrimination."  Gadson v. Concord Hosp., 966 F.2d 32, 34 (1st Cir. 1992).

II.   <u>Summary Judgment is not Appropriate</u>.

Marquez has satisfied her obligation at step one of the McDonnell Douglas paradigm; she has set forth sufficient factual allegations to establish a prima facie claim the she was subjected to unlawful discrimination.  In response, the DOJ has proffered a legitimate and non-discriminatory basis for its decision to terminate her employment: misconduct, a pattern of dishonesty, and a pattern of non-compliance with established internal policies and/or the law.  Thus, the burden remains with Marquez to demonstrate that there are genuinely disputed facts which, if credited by a trier of fact, would support her assertion that the DOJ's proffered explanation is merely a pretext for unlawful discrimination.  She has carried that burden.

In response to the DOJ's assertion that Marquez's employment was terminated because she had engaged in misconduct, a pattern of dishonesty, and a pattern of non-compliance with established internal policies and/or the law, Marquez has pointed to evidence which, if credited as true by the trier of fact, demonstrates the following.  First, Marquez did not engage in a "pattern" of dishonesty or misconduct.  The DOJ uses the term "pattern" to suggest that Marquez's inappropriate conduct was widespread and

routine.  But, in support of that position, the DOJ points to
only isolated events.  Of course, Marquez might well have engaged
in a "pattern of misconduct."  Then again, perhaps she did not.
At this juncture, however, based on the record currently before
the court, the DOJ has not supported its claim that Marquez
customarily engaged in undesirable or inappropriate conduct.

The sole incident involving potential dishonesty cited by
the DOJ relates to the inadvertent disclosure of grand jury
transcripts by Marquez's secretary and a perception by First
Assistant U.S. Attorney Rodriguez that Marquez was "dishonest"
about her role in that disclosure and tried to avoid
responsibility by blaming her secretary.  But, the evidence
provided by Marquez clearly shows that it was the secretary (not
Marquez) who made the inadvertent disclosure.  Marquez also
testified in her deposition that she specifically told her
secretary that the grand jury transcript was to be sent only to
the judge, for in camera review, and defense counsel was not to
be given a copy.  Rather than attempting to divert "blame" for
the unintentional disclosure to her secretary, Marquez wrote a
memo to a supervising AUSA explaining that both she and her
secretary had been working under a great deal of pressure and

said that the secretary was very competent in handling the
workload of three extremely busy AUSAs.

Marquez's evidence also shows that, upon learning of her
secretary's inadvertent disclosure of the grand jury transcripts,
she immediately filed a motion seeking that the transcript be
returned (which the court granted) and contacted the confidential
informant (whose identity had apparently been revealed in the
transcript) to see if she was concerned and/or wanted federal
protection or to be relocated.  The witness responded that she
was neither concerned nor fearful.

As to the alleged "pattern of non-compliance" with internal
policies and/or the law, the DOJ again points to a single event:
Marquez's alleged failure to comply with office expense
procedures before ordering a copy of a grand jury transcript.
Marquez, however, says that when the stenographer asked her if
she was going to need a copy of the transcript, she responded
"yes," and said she believed it was "essential."  Apparently,
based on that conversation, the stenographer made a copy of the
referenced transcript and left it on Marquez's desk.  When her
supervisors discovered that the transcript had been produced
without prior authorization, they apparently considered Marquez

13

to have violated internal policy.  Marquez, however, says she did not "order" a copy of the transcript prior to obtaining authorization to do so, nor did she believe that her response to the stenographer's question could have reasonably been interpreted as an official request for a copy of that transcript.

Again, if Marquez's plausible explanation is accepted, a reasonable trier of fact could conclude that she did not knowingly or intentionally violate internal policies, she certainly did not engage in any "pattern" of repeated violations of such policies, and the DOJ very well knew it.  Consequently, the trier of fact might also supportably conclude that the DOJ's proffered explanations for her dismissal are little more than a pretext for what Marquez says was the true motivation: unlawful discrimination.

Marquez has also pointed to evidence establishing that her internal job performance ratings were consistently high and, despite claims that she somehow "hindered" the office's prosecution of project "Grand Slam," she actually revived a neglected and stagnant prosecution that had lingered for over three years prior to her involvement, and she ultimately received national recognition for her superior work on the case.  She has

also pointed to sufficient circumstantial evidence to suggest that the "memo to file" prepared by AUSA David Rivera, her allegedly undesirable internal transfer, and, ultimately, the decision to terminate her employment, were either the product of gender or national origin discrimination or constituted a retaliatory response to her complaints about gender-based and national origin discrimination.

### Conclusion

At this juncture, Marquez need not prove her discrimination claims.  Instead, she need only demonstrate that there are genuinely disputed material facts which preclude entry of judgment as a matter of law in favor of the DOJ.  She has done so.  Accordingly, for the foregoing reasons, as well as those set forth in plaintiff's memorandum, defendant's motion for summary judgment (document no. 20) is denied.

        **SO ORDERED.**

                                    _____
                                    Steven J. McAuliffe
                                    Chief Judge

November 8, 2006

cc:  Judith Berkan, Esq.
     Mary Jo Mendez-Vilella, Esq.
     Carole M. Fernandez, Esq.
     Clerk of the U.S. District Court
          District of Puerto Rico

15